# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

LYNDSEA K. SULLIVAN,

                                            Plaintiff,

         v.                                                    1:22-CV-630
                                                               (GTS/ATB)

CITY OF GLENS FALLS, et al.,

                                            Defendants.

LYNDSEA K. SULLIVAN, Plaintiff, pro se

ANDREW T. BAXTER
United States Magistrate Judge

## ORDER and REPORT-RECOMMENDATION

The Clerk has sent to the court for review a civil rights complaint, filed by plaintiff Lyndsea K. Sullivan, together with an application to proceed in forma pauperis ("IFP"), and a motion for appointment of counsel. (Dkt. Nos. 1, 2, 4). The court has reviewed the plaintiff's IFP application and finds that plaintiff has demonstrated sufficient economic need. Therefore, plaintiff has met the financial criteria for proceeding IFP.

However, in addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915 (e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether

the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. *Neitzke*, 490 U.S. at 327; *Harkins v. Eldridge*, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants, and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atl. Corp.*, 550 U.S. at 555).

## II.   <u>Complaint</u>

Plaintiff alleges that in December of 2018, he was on parole and living in a boarding house at 178 Warren Street in the City of Glens Falls. (Complaint ("Compl.") ¶ 14 (Dkt. Nos. 1, 1-1).[1] Plaintiff claims that, on December 4, 2018, the owner of the

---

[1] Plaintiff has included 49 pages of exhibits with his complaint. (Dkt. No. 1-1). These exhibits have been considered by the court as part of the pleading.

boarding house, Rocco Musemeci,[2] spoke to defendant Glens Falls Police Officer ("GFPO") Bradley Murphy and "conspired" to have plaintiff "unlawfully arrested" which would result in his removal from the property. (*Id.*)  On the same day, at approximately 4:56 p.m., Justin Irby, another tenant at the boarding house, went to the Glens Falls Police Department and filed a complaint alleging that plaintiff threatened him with a knife on December 2, 2018. (Compl. ¶ 15).

Defendant Murphy took the complaint and requested the assistance of defendant GFPO Christopher Perilli and Officer Tanner[3] in administering the "double blind"[4] identification procedure to Mr. Irby. (*Id.*)  Officer Tanner assembled six photographs, one of which was a picture of the plaintiff.  Defendant Murphy then asked defendant Perilli to show the photographs to Mr. Irby.  Plaintiff claims that, at some point, defendant Murphy told defendant Perilli about the earlier telephone call from plaintiff's landlord and the "favor"[5] that was asked of the officer.  Plaintiff claims that defendant Murphy then told defendant Perilli that plaintiff's photo was number four in the array, in violation of the "double blind" procedure. (*Id.*)

Plaintiff claims that, after looking at the photos, Mr. Irby was hesitant to identify anyone depicted, and he was unsure if he recognized the perpetrator in the photos.

---

[2] It is unclear whether this is the correct spelling of this individual's last name. The court has copied the name from the complaint, and plaintiff questioned the accuracy of his spelling. (Compl. ¶ 14)

[3] Officer Tanner is not named as a defendant.

[4] According to the plaintiff and the exhibits attached to the complaint, the "double blind" procedure is used so that the officer who shows the photographs to the victim does not know who the suspect is in the array.

[5] Presumably, this "favor" was the request for help removing plaintiff from the boarding house.

(Compl. ¶¶ 16-23).  The procedure was video and audio taped, and plaintiff discusses how defendant Perilli encouraged Mr. Irby to make a choice, even though he could not decide between two photos. (*Id.*)  Plaintiff claims that defendant Perilli continued to insist that he choose a suspect, until Mr. Irby chose the plaintiff as the person who "probably" threatened him, even though at one point, Mr. Irby stated that he could not tell if he recognized anyone in the array. (Compl. ¶¶ 19-23).  Plaintiff also claims that, at some point, defendant Murphy became aware that there was security video footage of the place where the threat allegedly occurred, but he made no effort to watch the video to "confirm or deny" that the plaintiff was the perpetrator. (Compl. ¶ 23).

After Mr. Irby made the identification, defendants Murphy and Perilli went to the boarding house to arrest plaintiff. (Compl. ¶ 24).  The officers entered the building through the "common" doorway, and approached plaintiff's door, which was open. Plaintiff states that he was standing inside his apartment, when defendant Murphy leaned in, placed his hand on plaintiff and told him to come outside. (*Id.*)  Plaintiff complied with defendant Murphy's direction and was arrested as soon as he exited his apartment. (*Id.*)  Plaintiff states that the arrest was recorded by "body cam."  Plaintiff has attached the arrest report as part of Exhibit I to his complaint. (Compl. Ex. I at 4).

After plaintiff was read his *Miranda* warnings, he was transported to the police station for processing. (Compl. ¶ 25).  Plaintiff states that he thought that he was being questioned about an unrelated incident that occurred with his landlord, but instead, the officers began questioning him about what happened in the kitchen with Mr. Irby. (*Id.*) Defendant Murphy asked plaintiff whether he had a knife, and whether he had the knife

near Justin Irby. (Compl. ¶ 26).  Plaintiff states that he told defendant Murphy that he

only had a knife in his hand when he used it to cut an onion. (*Id.*)  Plaintiff claims that

defendant Murphy told plaintiff that there was a video of the incident, but Murphy

admitted that he had not seen the video. (Compl. ¶ 27).  Plaintiff claims that he asked

defendant Murphy why he had been arrested without a "complete" investigation, but

defendant Murphy told plaintiff that he had "enough" to arrest the plaintiff. (*Id.*)

Plaintiff was held until his arraignment on December 5, 2018.  Plaintiff was

charged with Criminal Possession of a Weapon, Third Degree and Menacing, Second

Degree. (Compl. Ex. I at 4).  After his arraignment, plaintiff was held without bail due

to his previous felony convictions. (Compl. ¶ 30).  On December 17, 2018, the matter

was transferred to the County Court for further proceedings. (Compl. ¶ 31).  However,

on February 11, 2019, the prosecutor filed a motion seeking to reduce the felony

charges to misdemeanors, and the case was sent back to City Court. (Compl. ¶ 32).  The

district attorney filed an information in City Court, charging plaintiff with Criminal

Possession of a Weapon, Fourth Degree and Menacing, Second Degree, both Class A

misdemeanors. (Compl. ¶ 33).  Plaintiff was arraigned on the new charges and bail was

set at $500.00. (Compl. ¶ 34).

On May 9, 2019, the Glens Falls City Court Judge held a hearing pursuant to

Huntley/Mapp/Wade/and Payton.[6] (Compl. ¶ 35).  On May 19, 2019, the district

---

[6] The court held a combined suppression hearing pursuant to *People v. Huntley*, 15 N.Y.2d 72 (N.Y. 1965) (suppression of defendants statements); *Mapp v. Ohio*, 367 U.S. 643 (1961) (suppression of evidence obtained through unconstitutional search); *United States v. Wade*, 388 U.S. 218 (1967) (suppression of identification testimony); *Payton v. New York*, 445 U.S. 573 (1980) (constitutionality of arrest in one's home).

attorney moved to further reduce the charges against plaintiff to Harassment, Second Degree, a violation, and plaintiff was released on his own recognizance. (Compl. ¶ 38). In an order dated June 19, 2019, the City Court judge suppressed the out-of-court[7] identification and any statements obtained as a result of the plaintiff's illegal arrest, in violation of *Payton v. New York*, 445 U.S. 573 (1980). (Compl. ¶ 39 & Pl.'s Ex. A at 4-7). Ultimately, on July 9, 2019, the day of trial, the prosecutor moved to dismiss all charges against plaintiff "in the interests of justice." (Compl. ¶ 40). Trial was adjourned, and the judge granted the motion on July 11, 2019. (Compl. ¶¶ 40-41).

Plaintiff claims he was subjected to false arrest, malicious prosecution, and abuse of process. He also claims that on December 4, 2018,[8] he "pleaded" with defendant GFPD Sergeant Carl J. Mattison to review the legality of plaintiff's arrest, and that defendant Mattison told plaintiff that he knew about the case, and he "signed off" on the arrest. (Compl. ¶ 44). Plaintiff claims that he told defendant Mattison that the "video surveillance" would prove plaintiff's innocence, and that it should have been obtained prior to arresting him. (Compl. ¶ 44). Defendant Mattison reminded plaintiff that he was on parole. (*Id.*)

Plaintiff claims that, on the morning of December 5, 2018, he "pleaded" with defendant Assistant Chief of Police Shawn Lovelace, who told plaintiff that he was aware of the case, that "the arrest was good," and that the officer had seen the

---

[7] Even though the judge suppressed the out-of-court identification, the judge did not preclude the prosecution from having the witness make an in-court identification as long as the identification had an independent source. (Pl.'s Ex. A at 4-5).

[8] This is the same day that he was arrested.

surveillance video. (Compl. ¶ 45).  Plaintiff states that he spent a total of 161 days in confinement between his arrest and when he was released on May 13, 2019. (Compl. ¶ 47).  Plaintiff states that the news reports of his arrest put him in an "unfavorable" light. (Compl. ¶ 48).

The rest of the complaint is divided into eight sections that plaintiff refers to as "claims." (Compl. ¶¶ 49-146).  Some of these sections contain "claims," and refer to the defendants against whom plaintiff brings these claims, but many contain further elaboration on plaintiff's statement of facts relating to his basic claims of false arrest, malicious prosecution, and abuse of process.  The court will attempt to summarize the remainder of the complaint.

Plaintiff asserts false arrest, malicious prosecution, and abuse of process against defendants Murphy and Perilli. (Compl. ¶ 67).  In what appears to be an attempt at raising an Equal Protection claim, plaintiff later states that he was treated differently by defendant Murphy because he was "on parole."[9]  Plaintiff claims that defendant Murphy "lied" about how the investigation began, when he omitted mentioning in the "incident" report that he had discussed plaintiff with his landlord[10] the day prior to Mr. Irby making a "walk-in" complaint. (Compl. ¶¶ 49-50).

Plaintiff's "second claim" consists of facts supporting his false arrest claim,

---

[9] Plaintiff believes that, if he had not been on parole, defendant Murphy would have investigated Mr. Irby's claims more thoroughly and would have watched the above-mentioned surveillance videos. (Compl. ¶¶ 106-108).

[10] Plaintiff alleges that his landlord threatened him over the telephone on the morning of December 4, 2018, claiming that he had "connections" with the police department and would have plaintiff removed from the boarding house. (Compl. ¶ 53).

based upon the unconstitutional identification procedure utilized by defendants Murphy and Perilli. (Compl. ¶¶ 54-68). Plaintiff's "third claim" is the description of defendants Murphy's and Perilli's illegal arrest in violation of *Payton, supra*, which was one of the bases for the judge's suppression order. (Compl. ¶¶ 69-80). Plaintiff's fourth claim is a discussion of defendant Murphy's "investigation," and how it should have been conducted according to plaintiff. (Compl. ¶¶ 81-110). Plaintiff claims that defendant Murphy should have watched the surveillance video[11] and should have interviewed witness Anibal Torres-Torres, who apparently was present at the time of the alleged threat, and whose testimony was allegedly vague and inconsistent. (*Id.*) Plaintiff claims that this deficient investigation by defendant Murphy contributed to plaintiff's illegal arrest and continued illegal detention. (*Id.*)

In his fifth claim, plaintiff alleges that defendant Sergeant Carl Mattison was "on duty" as a supervisor on December 4, 2018. (Compl. ¶ 111). Plaintiff claims that defendant Mattison was "fully aware" of Mr. Irby's complaint. (Compl. ¶ 113). Plaintiff alleges that it was defendant Mattison's "responsibility" to ensure that the officers he supervised followed proper procedure when putting together a photo array, and that he failed to do so. (Compl. ¶¶ 113-15). Plaintiff claims that defendant Mattison failed to ensure that defendant Murphy conducted a proper investigation, and

---

[11] Plaintiff states that the video would have exonerated him, and that defendant Murphy did not watch the video until six days after plaintiff's arrest. (Compl. ¶ 90). Plaintiff also alleges that defendant Murphy made it "perfectly clear" during his interview with the plaintiff that he "personally" wanted the plaintiff in jail, and that if plaintiff did not have a criminal record and was not on parole, Murphy would have viewed the video tape prior to arresting the plaintiff. (Compl. ¶ 106). Plaintiff associates this with an equal protection violation, but may be attempting to raise a claim of "negligent investigation."

that he "approved" the arrest of plaintiff without probable cause by defendants Murphy and Perilli. (Compl. ¶ 117).  Plaintiff states that, during processing, defendant Mattison asked plaintiff whether he was on parole, indicating that he was discriminating against plaintiff because he was on parole. (Compl. ¶¶ 118-19).  Plaintiff states that defendant Mattison is responsible through his "direct actions and omissions as Respondent [sic] Superior." (Compl. ¶ 119).

Plaintiff's sixth claim is against defendant Assistant Police Chief Shawn Lovelace, who supervised defendants Murphy, Perilli, and Mattison. (Compl. ¶¶ 120-30).  Plaintiff alleges that it is defendant Lovelace's responsibility to supervise his subordinates to ensure that they follow proper procedures. (Compl. ¶ 121).  Plaintiff claims that defendant Lovelace was "aware" of the investigation and arrest of plaintiff. (Compl. ¶ 122).  Plaintiff claims that, on December 5, 2018, when he "pleaded" with defendant Lovelace to review the validity of his arrest, defendant Lovelace told plaintiff that he had, and that "it look[ed] good." (Compl. ¶¶ 123-24).  Plaintiff claims that when he asked defendant Lovelace why plaintiff had been arrested prior to anyone watching the surveillance video, defendant Lovelace told him that they had "seen it." (Compl. ¶¶ 125-26). Plaintiff claims that defendant Lovelace was "deliberately indifferent" to the actions of defendants Murphy and Perilli. (Compl. ¶ 127).

Plaintiff alleges that defendant Lovelace then asked plaintiff where he was "going to parole to when he [got out] this time?" (Compl. ¶ 128).  Plaintiff interpreted this as a "threat" that he should not live in the City of Glens Falls any longer. (Compl. ¶ 129).  Plaintiff claims that defendant Lovelace discriminated against him based on his

parole status and therefore violated plaintiff's right to equal protection "through his direct actions and omissions as Respondent [sic] Superior." (Compl. ¶ 130).

Plaintiff's seventh claim is against defendant Sergeant Seth French. (Compl. ¶¶ 131-40). Plaintiff claims that defendant French took Anibal Torres-Torres's statement on December 5, 2018, and that Torres's statement did not corroborate Mr. Irby's statement. (Compl. ¶ 131-32). Plaintiff claims that on July 9, 2019, Mr. Torres contacted plaintiff to tell him that Torres had been threatened by plaintiff's landlord, and that Mr. Torres was "forced to make something up" or the "same thing" would happen to him. (Compl. ¶ 133). Torres allegedly told plaintiff that the police were "'in on it,'" and that the officer who took his statement told Torres to "say something about a knife." (Compl. ¶ 134). Plaintiff alleges that Torres told him that he knew that what happened to plaintiff was "wrong," and that he would testify at any civil actions brought by the plaintiff against these defendants. (Compl. ¶ 136).

Plaintiff claims that defendant French's actions "increased the likelihood" that plaintiff would "remain falsely imprisoned." (Compl. ¶ 137). Plaintiff claims that defendant French's actions contributed to plaintiff's false arrest, false imprisonment, and malicious prosecution. (Compl. ¶¶ 138-40). Plaintiff refers to defendant French's actions as "careless" and "deliberately indifferent" to plaintiff's illegal seizure, and to his due process rights. (Compl. ¶ 139). Plaintiff claims that defendant French's behavior shows the "current climate" of the Glens Falls Police Department regarding the incarceration of a "potentially innocent" person. (Compl. ¶ 138).

Finally, plaintiff's eighth claim is an attempt to establish municipal liability of

Glens Falls and the Glens Falls Police Department. (Compl. ¶¶ 141-46). Plaintiff alleges that the acts of the individual defendants establish that the municipal defendants had a custom or policy which encouraged the violation of individuals' rights to be free from false arrest, false imprisonment, malicious prosecution, abuse of process, negligent investigation, falsification of evidence, corruption, discrimination, and fraud. (Compl. ¶ 144).

Plaintiff seeks a substantial amount of monetary damages. (Compl. ¶ 148).

## III.   Statute of Limitations

### A.   Legal Standards

The statute of limitations for section 1983 cases is three years from the date that the plaintiff's cause of action accrued. *Owens v. Okure*, 488 U.S. 235, 249-51 (1989). While state law determines the limitations period, accrual of the plaintiff's claim is based upon federal law, "conforming in general to commonlaw tort principles." *McDonough v. Smith*, __ U.S. __,139 S. Ct. 2149, 2155 (2019).

#### 1.   False Arrest/False Imprisonment/Abuse of Process

Claims of false arrest and false imprisonment accrue against a plaintiff "when legal process [i]s initiated against him." *Steinbergin v. City of New York*, No. 21-536, 2022 WL 1231709, at *2 (2d Cir. Apr. 27, 2022) (citing *Wallace v. Kato*, 549 U.S. 384, 390 (2007)). The same is true for abuse of process claims. *Rich v. City of New York*, No. 21 Civ. 3835 (AT), 2022 WL 992885, at *9 (S.D.N.Y. Mar. 31, 2022) (citations omitted). The Second Circuit holds that such process begins when the criminal defendant is arraigned on the charges. *Steinbergin*, 2022 WL 1231709, at *2 (citing

*Watson v. United States*, 865 F.3d 123, 131 (2d Cir. 2017)).  The plaintiff need not wait for his conviction to be overturned or invalidated to pursue an arrest-based claim. *Id.* (citing *McDonough*, 139 S. Ct. at 2159 ("A false-arrest claim . . . has a life independent of an ongoing trial or putative future conviction—it attacks the arrest only to the extent it was without legal process, even if legal process later commences.")).

### 2.    Malicious Prosecution

Unlike false arrest and abuse of process, malicious prosecution claims do not accrue until the criminal proceeding ends without a conviction. *Thompson v. Clark*, _ U.S. _, 142 S. Ct. 1332, 1335 (2022); *see also McDonough v. Smith*, 139 S. Ct. at 2154-55.

### B.    Analysis

### 1.    False Arrest/False Imprisonment/Abuse of Process

In this case, plaintiff alleges that his arrest was orchestrated by his landlord and the defendant police officers and was not based on probable cause because the alleged victim was encouraged to choose plaintiff's photograph from a photo array.  Plaintiff was arrested on December 4, 2018, and he concedes that he was arraigned on the harassment charges on December 5, 2018.  Thus, for purposes of false arrest, his claim accrued when he was held over by the court after his arraignment on December 5, 2018. The statute of limitations would have expired on December 5, 2021.  Plaintiff's complaint is postmarked June 8, 2022, and giving plaintiff the benefit of the "prison mailbox rule,"[12] he may be deemed to have filed this action on June 8, 2022, instead of

---

[12] *Houston v. Lack*, 487 U.S. 266 (1988) (a pro se prisoner's papers are deemed "filed" at the moment of delivery to prison authorities for forwarding to the district court).  In this case, plaintiff's

the date that the court received his complaint on June 13, 2022.

Whether plaintiff's complaint was filed on June 8 or June 13, 2022, he is long past the three year statute of limitations for false arrest claims, the validity of which does not depend upon the ultimate result of plaintiff's criminal action. Even though plaintiff failed to file his complaint within the statute of limitations, the court must also consider whether the statute was tolled for any reason. Federal courts must abide by New York's tolling rules. *Bd. of Regents of Univ. of the State of N.Y. v. Tomanio*, 446 U.S. 478, 483 (1980). "On March 20, 2020, then-Governor Andrew Cuomo issued Executive Order 202.8, which tolled the statute of limitations in New York in light of the COVID-19 pandemic." *Rich v. New York*, No. 21 Civ. 3835 (AT), 2022 WL 992885, at *8 (S.D.N.Y. March 21, 2022) (citing 9 N.Y.C.R.R. § 8.202.8). The tolling period was subsequently extended until November 3, 2020. *Id.* (citing Exec. Order 202.67 (Oct. 4, 2020)).

Plaintiff states that he has filed within the statute of limitations because he filed the action within three years of the dismissal of his charges, which as discussed below is applicable to his malicious prosecution claim. (Compl. ¶ 4). Although plaintiff is incorrect regarding the accrual of the statute of limitations for false arrest and abuse of process, if the New York tolling rules apply, these claims may be timely. Thus, the court will not recommend dismissal of his false arrest/false imprisonment, and abuse of process claims at this time based on the statute of limitations, and instead will

---

complaint is not dated, thus, the court has used the postmark on his envelope as the date of filing. Any minor discrepancy will not affect the court's decision since the plaintiff has missed the deadline by several months.

recommend that the case to go forward as discussed below, giving the parties an opportunity to determine whether any tolling should apply,[13] because if it were not for the potential statute of limitations bar, plaintiff's allegations of false arrest, false imprisonment, and abuse of process could state claims for relief.

### 2.    Malicious Prosecution

Unlike false arrest, false imprisonment, and abuse of process, malicious prosecution claims do not accrue until the criminal proceeding ends without a conviction. *Thompson v. Clark*, at 1335.  *See also McDonough v. Smith*, 139 S. Ct. at 2154-55.  In this case, plaintiff filed this action within three years of the dismissal of his criminal conviction.  Thus, there is no statute of limitations issue for this claim.  The court will proceed to consider the merits of the plaintiff's allegations.[14]

## IV.    <u>False Arrest</u>

### A.    Legal Standards

A section 1983 claim for false arrest is essentially the same as a claim for false arrest under New York law. *Weyant v. Okst* 101 F.3d 845, 852 (2d Cir. 1996).  The New York State standard for false arrest requires that: "'(1) the defendants intended to

---

[13] The court also notes that in "rare and exceptional circumstances," equitable tolling may also be applied to save the plaintiff from dismissal based on the statute of limitations. *See Covington v. New York City Police Dep't*, 471 F. App'x 28, 29 (2d Cir. 2012) (citing *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir.2005)).  In such case, the court must find that extraordinary circumstances prevented a party from timely performing the required act, and that the party acted with "reasonable diligence throughout the period he sought to toll." *Id.*

[14] Plaintiff appears to allege some sort of equal protection claim based on his classification as a parolee.  This claim would also have accrued at the time that plaintiff was arrested, and would likely be barred by the statute of limitations.  However, because this claim fails to state a claim for relief as discussed below, the court will not discuss the statute of limitations further for this claim.

confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" *Sethi v. Nassau County*, No. 11-CV-6380, 2014 WL 2526620, at *3 (E.D.N.Y. June 3, 2014) (quoting *Jocks v. Tavernier*, 316 F.3d 128, 134-35 (2d Cir. 2003)).

"Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Triolo v. Nassau County*, No. 19-4107-CV, __ F.4th __, 2022 WL 186567, at *4 (2d Cir. Jan. 21, 2022) (citing *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016) ("The existence of probable cause to arrest – even for a crime other than the one identified by the arresting officer – will defeat a claim of false arrest under the Fourth Amendment."); *De Lourdes Torres v. Jones*, 26 N.Y.3d 742, 759 (2016) ("For purposes of the privilege element of a false arrest and imprisonment claim, an act of confinement is privileged if it stems from a lawful arrest supported by probable cause.")).

## B.   Analysis

Generally a suggestive identification procedure will not be constitutionally relevant for a civil action under section 1983.[15] *Mara v. Rilling*, 921 F.3d 48, 75 (2d

---

[15] As the court in *Mara* stated, the concern for suggestive identifications relates to their admission as evidence at trial, not whether they can support a finding of probable cause. 921 F.3d at 75. A defective procedure must be more than suggestive and inadmissible at trial, but it must be so defective that "as a matter of law," it could not support a finding of probable cause, thus leading to a false arrest. *Id*. The example of a defective identification cited in *Mara* involved a situation in which the officer told the witness that he **"had to pick someone"** out of the array. *Id*. (citing *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007) (emphasis added). The court in *Stansbury* explained the distinction: "procedures that simply 'increase the odds' that a witness will identify the defendant are not so defective as to preclude reliance for probable cause, while procedures that force the witness to make an identification do rise to that level." *Id*. This court makes no finding regarding the ultimate

Cir. 2019). However, the false identification may be the basis for such a claim when it was "so defective" that, as a matter of law, "'probable cause could not reasonably be based on it.'" *Id.* (quoting *Stansbury v. Wertman*, 721 F.3d at 91 n.7 (2d Cir. 2013) (quoting *Jenkins v. City of New York*, 478 F.3d 76, 93 (2d Cir. 2007)) (internal quotations omitted). Although the court makes no such finding, in this case, plaintiff's claim that the identification procedure was wilfully tainted could meet this standard, and thus, will survive initial review on the false arrest claim as against defendant Murphy and Perilli.[16]

## V.   **Abuse of Process**

### A.   **Legal Standards**

In order to establish liability for malicious abuse of process under section 1983, the plaintiff must establish the claim's elements under New York State law as well as the deprivation of a constitutional right. *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 446-47 (E.D.N.Y. 2012), *aff'd sub nom. Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 F. App'x 770 (2d Cir. 2013) (citing *Cook v. Sheldon*, 41 F.3d 73, 79-80 (2d Cir. 1994)). In order to state a claim for abuse of process, plaintiff must allege that the defendant: "'(1) employ[ed] regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse [or] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.'" *Id.* (quoting *Savino v. City of New York*, 331 F.3d

---

merits of the plaintiff's claim. I merely indicate that plaintiff may state a claim if he is able to surmount the statute of limitations bar.

[16] The court will discuss the potential liability of the supervisory defendants below.

63, 76 (2d Cir.2003) (quoting *Cook*, 41 F.3d at 80)).  Abuse of process is a denial of procedural due process. *Id.* (citations omitted).

In order to meet the "collateral objective" standard, "'it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.'" *Id.* at 448 (quoting *Savino*, 331 F.3d at 77).  In this case, plaintiff seems to allege that defendant Murphy engaged in conduct with the collateral objective of removing plaintiff from his landlord's boarding house.  While this court does not make any findings regarding the merits of this claim or whether it meets any of the requirements of abuse of process, the court finds that it may survive initial review as against defendants Murphy and Perilli.[17] There is no indication that any of the other defendants were aware of the alleged agreement between plaintiff's landlord and defendant Murphy, and thus, plaintiff has not stated that any of the other defendants had a "collateral objective."  Thus, the court will recommend dismissal without prejudice as to all defendants but defendants Murphy and Perilli.[18]

---

[17] The court notes that the abuse of process claim has the same accrual date as false arrest, and thus, without either COVID-19 tolling or equitable tolling, this claim would not survive dismissal based on the statute of limitations.

[18] Plaintiff does allege that defendant Perilli was aware of the conversation between defendant Murphy and plaintiff's landlord and was aware of the "favor" requested by defendant's landlord. (Compl. ¶ 15).

## VI. __Malicious Prosecution__

### A. __Legal Standards__

Section 1983 malicious prosecution claims are brought pursuant to the Fourth Amendment. *Barnes v. City of New York*, No. 18-CV-7119 (AJN), 2020 WL 6947424, at *5 (S.D.N.Y. Nov. 25, 2020) (citing *Coleman v. City of New York*, 688 F. App'x 56, 57 (2d Cir. 2017) ("[A] malicious prosecution claim brought under § 1983 is grounded in the Fourth Amendment") (citing *Albright v. Oliver*, 510 U.S. 266, 274-75 (1994)); *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997) ("[i]n order to prevail on such a claim under § 1983, the plaintiff must show a violation of his rights under the Fourth Amendment") (citing *Albright*, 510 U.S. at 274-275)).

In order to prevail on a constitutional claim for malicious prosecution, plaintiff must establish the elements for malicious prosecution under New York State law. *Manganiello v. City of New York*, 613 F.3d 149, 160-61 (2d Cir. 2010) (citing inter alia *Murphy v. Lynn*, 118 F.3d 938, 944 (2d Cir. 1997); *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)).  To establish a claim for malicious prosecution under New York law, the plaintiff must show: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions. *Id.* (citing inter alia *Murphy v. Lynn*, 118 F.3d at 947; *Broughton v. State*, 37 N.Y.2d 451, 457 (1975)).

In this case, plaintiff has pled sufficient facts to survive initial review as against defendants Murphy and Perilli for malicious prosecution.  Plaintiff claims that

defendant Murphy spoke with plaintiff's landlord about making false claims against plaintiff in an effort to have plaintiff removed from the boarding house. Plaintiff also alleges that after Mr. Irby walked into the police station to make a complaint, defendants Murphy and Perilli attempted to influence Mr. Irby's identification of the plaintiff and arrested plaintiff on that basis, causing his prosecution on charges that were first reduced, and later dismissed in the interests of justice on July 19, 2019.

## VII.   <u>Equal Protection</u>

### A.   **Legal Standards**

"The equal protection clause directs state actors to treat similarly situated people alike." *Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995). It "prohibits selective enforcement based on an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979) (internal quotation marks omitted). "To prove an equal protection violation, claimants must prove purposeful discrimination, . . . directed at an identifiable or suspect class." *Id.* (citations omitted).

"[A] plaintiff may assert a 'selective enforcement' claim by showing [he was] treated differently based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Kisembo v. NYS Office of Children and Family Servs*., 285 F. Supp. 3d 509, 524 (N.D.N.Y. 2018) (internal quotations omitted) (quoting *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 301 (S.D.N.Y. 2013)). "[A plaintiff] may [also] assert a so-called 'class of one' claim by alleging that [he was] intentionally treated differently

from others similarly situated and that there was no rational basis for this difference in treatment." *Id.* (internal quotations omitted) (quoting *Doe v. Village of Mamoroneck*, 462 F. Supp. 2d 520, 558 (S.D.N.Y. 2006)). The aforementioned theories of liability "require a showing of similarly situated individuals or groups who were treated differently."[19] *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 693 (S.D.N.Y. 2011).

### B.     Analysis

In this case, plaintiff vaguely alleges that defendants treated him differently because he was on parole, but does not mention any other similarly situated individual who was not on parole, but was treated differently by the defendants.  He also fails to explain how an individual who was not on parole would have been treated in the situation.  Plaintiff's status as a parolee is not a suspect classification. *See e.g. Scott v. Woodworth*, No. 9:12-CV-20 (LEK/CFH), 2013 WL 3338574, at * 13 (N.D.N.Y. July 2, 2013) ("'Parolees do not constitute a suspect or quasi-suspect class, requiring heightened scrutiny for purposes of equal protection analysis.'") (quoting *Bratton v. New York State Div. of Parole*, No. 5:05-CV-950 (NAM), 2008 WL 1766744, at *11 (N.D.N.Y. 2008)); *Gray v. Bansley/Anthony/Burdo, LLC*, 3:19-CV-1869 (KAD), 2020 WL 292230, at *4 (D. Conn. Jan. 21, 2020) ("status as either a probationer or parolee is not an "impermissible consideration" as it does not implicate a suspect class or an

---

[19] A plaintiff may also assert an equal protection claim based upon the unequal application of a statute which does not require plaintiff to "plead or show the disparate treatment of other similarly situated individuals." *Pyke v. Cuomo*, 258 F.3d 107, 108–09 (2d Cir. 2001).  To the extent that the court can discern an equal protection claim in the plaintiff's papers, this alternative method of asserting an equal protection claim does not apply.

otherwise recognized "protected right").  Plaintiff's allegations are simply too vague to establish an equal protection violation.  Thus, to the extent that plaintiff is attempting to raise such a claim, it may be dismissed as to all defendants.

## VIII. Negligent Investigation

### A.    Legal Standards

"'New York does not recognize an action alleging negligent investigation or prosecution of a crime, as the police are not obligated to follow every lead that may yield evidence beneficial to the accused.'" *Ferreira v. City of Binghamton*, 975 F.3d 255, 276 (2d Cir. 2010) (quoting *Hernandez v. State of New York,* 228 A.D.2d 902, 644 N.Y.S.2d 380, 382 (1996)).  "'[A] party seeking damages for an injury resulting from a wrongful arrest and detention is relegated to the traditional remedies of false arrest and imprisonment.'" *Id.* (quoting *Higgins v. City of Oneonta*, 208 A.D.2d 1067, 617 N.Y.S.2d 566, 568 (1994)).

### B.    Analysis

In this case, plaintiff appears to be trying to raise a claim of "negligent investigation," relative to his arrest and prosecution.  He alleges that the defendants, particularly the supervisory defendants should have examined the surveillance video before or shortly after he was arrested.  A claim that the defendant failed to investigate further is not constitutionally relevant. *See Fabrikant v. French*, 691 F.3d 193, 214-15 (2d Cir. 2012) (quoting *Krause v. Bennett*, 887 F.2d 362, 371 (2d Cir. 1989)) ("It is 'of no consequence' to a probable cause determination 'that a more thorough or more probing investigation might have cast doubt upon the situation.'")

Moreover, according to *Ferreira*, under New York State law, such a claim is not separate from the false arrest and malicious prosecution claims and would not be actionable.  In *Ferreira*, the court allowed a claim of negligent investigation relative to claims that because of a lack of planning, individuals were injured physically during a police raid. 975 F.3d at 275-76.  The court was careful to make the distinction between negligence in developing probable cause and negligence in police conduct during the subsequent arrest. *Id.*  Because plaintiff in this case makes claims based solely on his arrest and the prosecution of his case, he does not state a separate claim under federal or New York State law for negligent investigation.

## IX.   **Personal Involvement**

### A.   **Legal Standards**

It has long been established that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983[,]" and supervisory officials may not be held liable merely because they held a position of authority.  *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citations omitted); *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). *See also Grullon v. City of New Haven*, 720 F.3d 133, 138-39 (2d Cir. 2013).  In *Colon v. Coughlin*, 58 F.3d 865 (2d Cir. 1995), the Second Circuit articulated standards for courts to use when determining personal involvement or supervisory liability.[20]

---

[20] These factors were:
> (1) the defendant participated directly in the alleged constitutional violation;
> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong;
> (3) the defendant created a policy or custom under which

However after the Supreme Court's decision in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the factors articulated in *Colon* were called into question.  District courts, including the Northern District of New York[21] noted the possibility that the *Colon* factors were no longer viable.  Eventually, the Second Circuit revised its standard for determining personal involvement or supervisory liability, finding that the *Colon* factors are no longer controlling and articulating the proper standard for the courts in this circuit to utilize. *Tangreti v. Bachmann*, 983 F.3d 609, 618 (2d Cir. 2020) (quoting *Ashcroft v. Iqbal*, 556 U.S. at 676).

Joining other circuits, the Second Circuit held that, after *Iqbal*, there is no "special" rule for supervisory liability. *Id.*

> Instead, a plaintiff must plead and prove "that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676 . . . . "The factors necessary to establish a [§ 1983] violation will vary with the constitutional provision at issue" because the elements of different constitutional violations vary. *Id.* The violation must be established against the supervisory official directly.

*Id.* (quoting *Iqbal*, 556 U.S. at 676).  The supervisor must have committed the violation

---

unconstitutional practices occurred, or allowed the continuance of such a policy or custom;
(4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or
(5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.
*Colon*, 58 F.3d at 873.

[21]  *See e.g. Vance v. State of New York*, No. 9:19-CV-748 (BKS/ATB), 2020 WL 7481585, at *3 & n.3 (N.D.N.Y. Nov. 30, 2020) (discussing cases), *report-recommendation adopted*, 2020 WL 7480955 (N.D.N.Y. Dec. 18, 2020).

him or herself, not by the supervision of others who committed the violation. *Id.* Likewise, the supervisor must personally display the requisite state of mind, depending on the violation at issue. *Id.*

### B.   Analysis

In this case, plaintiff names Sergeant Carl Mattison, Detective Sergeant Seth French, and Assistant Police Chief Shawn Lovelace as defendants.  These individuals were not involved with the photo array or in plaintiff's actual arrest.  Plaintiff allegedly spoke to these individuals after he had been arrested.

### 1.   Defendant Mattison

Plaintiff alleges that, while he was being held after his arrest on December 4, 2018, he spoke to defendant Mattison and asked him to investigate the validity of the arrest.  Plaintiff claims that after Mr. Irby identified plaintiff, defendant Mattison "approved" the arrest. (Compl. ¶ 69).  There is no indication that defendant Mattison had any other involvement with plaintiff's arrest, that he was aware of defendant Murphy's agreement with plaintiff's landlord, or that he was in any way involved with giving evidence to the District Attorney for plaintiff's prosecution.

In *Taylor v. City of New York*, No. 19 CIV. 6754 (KPF), 2022 WL 744037, at *11 (S.D.N.Y. Mar. 11, 2022), the court denied summary judgment to an officer where there was evidence allowing the court to infer that the defendant "personally signed off on Plaintiff's arrest soon after he had been detained."  However, the court in *Taylor* also recognized that the "supervising officer's mere signature on arrest paperwork, in isolation, is likely to be insufficient to create a genuine dispute of material fact as to

that officer's personal involvement in an arrest." *Id.* at * 12 (citing *Drayton v. City of New York*, No. 17 Civ. 7091 (RRM/RLM), 2020 WL 2615930, at *5 (E.D.N.Y. May 20, 2020)).  In this case, it is unclear what involvement defendant Mattison had in plaintiff's arrest.  It is unclear who signed the arrest paperwork, although a badge number is visible. (Pl.'s Ex. D).  At this early stage of the proceedings, the court must accept plaintiff's statements that defendant Mattison approved the arrest prior to its execution.[22]  Thus, the court finds that plaintiff's claims may proceed as against defendant Mattison for false arrest, but may not proceed as written for plaintiff's malicious prosecution or abuse of process claims.

## 2.    Defendant French

Plaintiff also seeks to assert claims against defendant Sergeant French.  Plaintiff alleges that defendant French took the statement of Anibal Torres-Torres after plaintiff's arrest, and that the witness was told to lie about the incident - to "say something about a knife."[23] (Compl. ¶ 134).  If defendant French assisted in falsifying evidence which was later given to the prosecution, then defendant French could be liable for malicious prosecution, although not for false arrest or abuse of process because he was not involved in plaintiff's arrest in any way, and by the time that he took the witness's statement, plaintiff had been arraigned on the charges and was held

---

[22] To the extent that plaintiff claims that he asked defendant Mattison to examine or investigate the "validity" of the arrest, defendant Mattison's failure to do so does not rise to the level of a separate constitutional violation and would be part of the false arrest claim. *See Fabrikant v. French*, *supra*; *Ferreira, supra.*

[23] While the court understands that this statement is hearsay because it was told to the plaintiff by Anibal Torres one year after the incident, at this stage of the litigation, the court must allow the claim to proceed.

pursuant to the judge's order.  At this stage of the case, the court will recommend allowing plaintiff's claims to go forward as to defendant French for malicious prosecution, but will recommend dismissal of any other claims against this defendant.

### 3.    Defendant Lovelace

Finally, plaintiff names Assistant Chief Shawn Lovelace as a defendant.  Plaintiff alleges that after he was arrested on December 4, 2018, he pleaded with Chief Lovelace to investigate the validity of plaintiff's arrest.  Plaintiff does not assert that defendant Lovelace was involved in the investigation, the witness statement, or the arrest of plaintiff.  He was apparently named as a defendant because he was in a supervisory position and allegedly failed to remedy the situation after plaintiff was arrested.  The fact that Chief Lovelace "knew" about the arrest is insufficient to assert a claim of false arrest or of malicious prosecution since there is no allegation that he was involved in either. *See Greathouse v. Vasquez*, No. 20-CV-8748 (PAE/SN), 2021 WL 6334689, at *5 (S.D.N.Y. Dec. 17, 2021) ("A supervisor's 'mere knowledge' of a subordinate's unconstitutional behavior is insufficient. . . . 'The violation must be established against the supervisory official directly.'" ) (quoting *Tangreti*, 983 F.3d at 618).  As stated above, the fact that plaintiff "pleaded with" defendant Lovelace to investigate the validity of his arrest does not form the basis for a section 1983 claim. *Fabrikant, supra.* Thus, the complaint may be dismissed in its entirety as against defendant Lovelace.

## X.    <u>Municipal Liability</u>

### A.    Legal Standards

A municipality may only be named as a defendant in certain circumstances.  In

*Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983.  A municipality may not be held liable solely because it employs a tortfeasor.  *LaVertu v. Town of Huntington*, No. 13-CV-4378, 2014 WL 2475566, at *3 (E.D.N.Y. Apr. 4, 2014) (citing inter alia *Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 35 (2010)), *report recommendation adopted in relevant part*, 2014 WL 2506217 (E.D.N.Y. June 2, 2014).  Only when the municipality, through the execution of its policies, actually deprives an individual of his constitutional rights, is it liable for the injury.  *Monell*, 436 U.S. at 694.

"The existence of a municipal policy that gives rise to *Monell* liability can be established in four ways: (1) a formal policy endorsed by the municipality; (2) actions directed by the government's 'authorized decisionmakers' or 'those who establish governmental policy;' (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees[.]" *Deferio v. City of Syracuse*, 770 F. App'x 587, 590 (2d Cir. 2019)(cleaned up).  "Once a plaintiff has demonstrated the existence of a municipal policy, a plaintiff must then establish a causal connection, or an 'affirmative link,' between the policy and the deprivation of his constitutional rights. *Id.* (citing *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985)); *see also Bd. of the Cty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997) (holding that plaintiff must "demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged").

A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985)) ("[A] 'policy' of 'inadequate training' " is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell* ").  To satisfy the statute, the municipality's "failure to train its employees in a relevant respect must amount to "'deliberate indifference to the rights of persons with whom the [untrained employees] come into contact.'" *Id.* (quoting *Canton v. Harris*, 489 U.S. 378, 388 (1989)).  "Only then 'can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983.'" *Id.* (quoting *Canton*, 489 U.S. at 389).

### B.    Analysis

The court would first point out that, in addition to the City of Glens Falls, plaintiff names the Glens Falls Police Department as a defendant.  "'A police department is a municipal arm of the municipal corporation.'" *Farnsworth v. City of Geneva*, No. 20-CV-6935 (FPG), 2022 WL 1539541, at *2 (W.D.N.Y. May 16, 2022) (quoting *Jackson v. Cty. of Erie*, No. 17-CV-396, 2020 WL 5642277, at *4 (W.D.N.Y. Sept. 22, 2020) (internal quotation marks omitted)).  "'Because a police department does not exist separate and apart from the municipality, it is not considered its own legal entity, and cannot sue or be sued.'" *Id.*  Plaintiff has named the City of Glens Falls, thus, naming the Police Department is redundant, and the complaint may be dismissed with prejudice as against this defendant.

With respect to the City of Glens Falls, plaintiff has failed to state a claim for

municipal liability.  Plaintiff specifically states that the defendants acted in violation of municipal policy after Officer Tanner put the photo array together.  This statement of facts is confirmed by the City Court judge's 2019 suppression decision, in which he specifically stated "[i]n the present case, the photo array failed to use the double blind practice that is ***regularly used by the Glens Falls Police Department***.  This allowed the officer conducting the photo array to know which photograph was the suspect." (Compl. Ex. A - *People v. Sullivan*, No. CR-2523-18 (Decision and Order at 5) (Dkt. No. 1-1).

In the usual case, a single incident involving actors below the policymaking level of authority will not suffice to establish municipal liability. *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). Instead, the plaintiff must allege a discriminatory practice which is "'so manifest as to imply the constructive acquiescence of senior policy[ ]making officials.'" *Thomas v. Town of Lloyd*, No. 1:21-CV-1358, 2022 WL 1747650, at *3 (N.D.N.Y. May 31, 2022) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 871 (2d Cir. 1992)).  Plaintiff has only cited his own situation, and has clearly stated that the officers acted contrary to the policy established by the department for conducting photo identifications.  He has not cited any other incidents of such conduct which could establish that there was an "unofficial" policy allowing such violations to occur. "To prove the third *Monell* kind of liability—custom or usage—the plaintiff must establish a longstanding practice or custom which constitutes standard operating procedure." *Gleeson v. Cty. of Nassau*, No. 15-CV-6487, 2019 WL 4754326, at *15 (E.D.N.Y. Sept. 30, 2019) (citing *Jett v. Dallas Independent School Dist.*, 491 U.S. 701, 737 (1989)).

29

"The policy must be 'so manifest as to imply the constructive acquiescence of senior policy-making officials.'" *Id.* (quoting *Byvalets v. NYC Housing Authority*, No. 16-CV-6785, 2017 WL 7793638, at *16 (E.D.N.Y. July 28, 2017)); *see also Board of County Comm'rs. v. Brown*, 520 U.S. 397, 404 (1997) (The relevant custom must be "so widespread as to have the force of law.").  Plaintiff has failed to do so in this case. Thus, plaintiff has failed to state a claim for municipal liability against Glens Falls, and the complaint may be dismissed as against this defendant without prejudice as discussed below.

## XI.   **Opportunity to Amend**

### A.   **Legal Standards**

Generally, before the court dismisses a pro se complaint or any part of the complaint sua sponte, the court should afford the plaintiff the opportunity to amend at least once, however, leave to re-plead may be denied where any amendment would be futile. *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993).  Futility is present when the problem with plaintiff's causes of action is substantive such that better pleading will not cure it. *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation omitted).

### B.   **Analysis**

The court is recommending dismissal with prejudice only as to the Glens Falls Police ***Department*** because a department may not be sued, and plaintiff has already named the City of Glens Falls.  The court is recommending dismissal without prejudice and with an opportunity to amend as against defendant Lovelace for failure to assert

personal responsibility over the false arrest, malicious prosecution, and abuse of process claims.  Although plaintiff has failed to properly allege personal involvement of this supervisory officials, the court cannot say that any amendment would be futile. The court also recommends dismissal without prejudice of any equal protection claims and negligent investigation claims as against all defendants.

The court also recommends that the claims against the City of Glens Falls be dismissed without prejudice and with the opportunity for amendment.  The plaintiff has failed to state a claim for municipal liability as discussed above, but the court cannot say at this early stage of the litigation that plaintiff would be unable to amend his complaint to state such a claim.

The court recommends that the claims of false arrest, malicious prosecution, and abuse of process proceed as against defendants Murphy and Perilli.[24]  The court also recommends that the claim of false arrest also proceed as against defendant Mattison, while claims of malicious prosecution and abuse of process be dismissed. The court recommends that the claim of malicious prosecution also proceed as to defendant French, while claims of false arrest and abuse of process be dismissed. However, the court will not order service on these defendants until the District Judge has acted on this Order and Report-Recommendation; plaintiff, if allowed by the District Judge, has had the opportunity to amend his complaint; and this court has reviewed any amendments.

---

[24] In making this determination this court makes no finding as to whether any claims would survive a properly supported motion to dismiss or one for summary judgment, particularly in view of the possible statute of limitations issues.

However, if plaintiff does file a proposed amended complaint for the court's review, it must be a ***complete pleading*** which ***supercedes the original***.  None of the original complaint may be incorporated by reference.  "One of the purposes of the requirement that an amended complaint be a complete pleading is to ensure that all of the allegations asserted against the defendant(s) are contained in a single document, thereby reducing the likelihood that a party will overlook one or more allegations against him." *See Walker v. Fischer*, No. 10-CV-1431 (MAD/DEP), 2012 WL 1029614, at *10 (N.D.N.Y. Mar. 26, 2012) (citation omitted).

## XII.   Appointment of Counsel

### A.   Legal Standards

There is no right to appointment of counsel in civil matters. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994).  Title 28 of United States Code Section 1915 specifically provides that a court may request an attorney to represent any person "unable to afford counsel."  28 U.S.C. § 1915(e)(1).  Appointment of counsel must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Cooper v. A. Sargenti, Inc.*, 877 F.2d at 172-73.

Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin*, 114 F.3d 390, 392-93 (2d Cir. 1997).  Instead, a number of factors must be carefully considered by the Court in ruling upon such a motion.  As a threshold matter, the Court should ascertain whether the indigent's claims seem likely to be of substance.  If so, the Court should

then consider:

> The indigent's ability to investigate the crucial facts, whether conflicting
> evidence implicating the need for cross examination will be the major
> proof presented to the fact finder, the indigent's ability to present the
> case, the complexity of the legal issues and any special reason in that
> case why appointment of counsel would be more likely to lead to a just
> determination.

*Terminate Control Corp. v. Horowitz*, 28 F.3d 1335, 1341 (2d Cir. 1994) (quoting

*Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)).  This is not to say that all, or

indeed any, of these factors are controlling in a particular case.  Rather, each case must

be decided on its own facts. *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y.

1995) (McAvoy, C.J.) (citing *Hodge*, 802 F.2d at 61).

    **B.    Analysis**

    This action was only recently commenced. Thus, there are no facts presented to

the court upon which this court may base its decision as to whether this lawsuit is of

substance.  Where there are merely unsupported allegations, the moving party does not

meet the first requirement imposed by the Second Circuit for appointment of pro bono

counsel.  *See Harmon v. Runyon*, No. 96-Civ.-6080, 1997 WL 118379 (S.D.N.Y. Mar.

17, 1997).  In addition, I have recommended dismissal of some of plaintiff's claims

without prejudice and with an opportunity to amend.  Thus, at this early stage of the

litigation, the court will deny plaintiff's motion (Dkt. No. 4) without prejudice.

    **WHEREFORE**, based on the findings above, it is

    **ORDERED**, that plaintiff's application to proceed IFP (Dkt. No. 2) is

**GRANTED**, and it is

**RECOMMENDED**, that the complaint be dismissed **WITH PREJUDICE** as to the **GLENS FALLS POLICE DEPARTMENT**, and it is

**RECOMMENDED**, that the complaint in its entirety be **DISMISSED WITHOUT PREJUDICE as to DEFENDANTS CITY OF GLENS FALLS and LOVELACE**, and it is

**RECOMMENDED**, that

(1)     the claims for false arrest, malicious prosecution, and abuse of process proceed as against defendants Murphy and Perilli;

(2)     the claim for false arrest also proceed as against defendant Mattison, while the claims for malicious prosecution and abuse of process be dismissed without prejudice as to this defendant; and

(3)     the claim for malicious prosecution also proceed as against defendant French, while the claims for false arrest and abuse of process be dismissed without prejudice as to this defendant;

However, the court will defer service on the defendants until the District Judge has the opportunity to review this Order and Report-Recommendation and plaintiff has had the opportunity to amend his complaint, if appropriate, and it is

**RECOMMENDED**, that to the extent that plaintiff is attempting to assert an equal protection claim or a claim for "negligent investigation", they be **DISMISSED WITHOUT PREJUDICE** as against all defendants, and it is

**RECOMMENDED**, that if the District Judge approves this Order and Report-Recommendation, plaintiff be given thirty (30) days from the date of the District

34

Judge's order within which to submit a proposed amended complaint to the court for its consideration, and it is

**RECOMMENDED**, that after the expiration of thirty (30) days, or any extended time ordered by the court, the complaint or any amended complaint may be returned to me for further review, and it is

**RECOMMENDED**, that if the court approves this recommendation, and plaintiff chooses to file an amended complaint, plaintiff be warned that any such amended complaint must be a ***complete pleading*** which will supercede the original and must set forth ***all*** of the claims plaintiff seeks to assert in this action against the persons named as defendants and may ***not*** incorporate by reference or otherwise any claims contained in the original complaint, and it is

**ORDERED**, that plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED WITHOUT PREJUDICE AS PREMATURE**, and it is

**ORDERED,** that the Clerk of the Court shall serve a copy of this Order and Report-Recommendation on plaintiff in accordance with the Local Rules.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636 (b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: July 1, 2022

Andrew T. Baxter
U.S. Magistrate Judge